Taylor, J.
This case concerns eligibility for worker’s compensation benefits pursuant to the Worker’s Disability Compensation Act (wdca) definition of disability at MCL 418.301(4) and the reasonable employment provisions, MCL 418.301(5), of that act. The Court of Appeals effectively concluded that under § 301(4)’s definition of disability as interpreted in Haske v Transport Leasing, Inc, 455 Mich 628; 566 NW2d 896 (1997), plaintiff was disabled and entitled to wage loss benefits. We conclude that the Haske definition of disability is erroneous and should be overruled. Accordingly, we vacate the decision of the Court of Appeals and remand the case to the wcac for further proceedings consistent with this opinion.
i
A
A review of the relationship in the worker’s compensation statute between “disability” and “favored work” (or as it is now formally called in the wdca, “reasonable employment”) is helpful in understanding what is at issue in this case.
There are circumstances in which a work-related injury might prevent an employee from continuing to perform one or even more of the complex of tasks in the job he was performing at the time of the injury, but in which, even with such a limitation, that employee may still be able to perform the job suffi *147 ciently so that his wage earning capacity is not affected in that job. For example, such an injury might render an employee unable to perform a job that requires continuous standing, but nevertheless leaves the employee able to perform a job suitable to his qualifications and training in which the employee can sit while performing most or all his job duties to the degree that his ability to earn equivalent wages is not different than before the injury.
Historically, such a situation posed a dilemma for the worker’s compensation system. As the courts dealt with difficult cases in which an employee could suffer a work-related injury and be limited, to one degree or another, in his ability to perform work, but not rendered altogether unable to work, judges developed the common-law mitigation doctrine of “favored work.” Under the favored-work doctrine, an employer could generally require an injured employee, eligible for worker’s compensation benefits, to do other work that the employee was reasonably capable of performing. The wages earned in the “easier” job could be used by the employer as a setoff, or mitigation, against the employer’s worker’s compensation liability. If the employee unreasonably refused to participate in the favored work, i.e., the “easier job,” the penalty was loss of worker’s compensation benefits.[1] *148 There were also common-law protections that the courts developed to protect the employee from being exploited during the period he was engaged in favored work.[2] This approach to favored work, with its emphasis on mitigation, was felt to advance the interests of the employee by encouraging his reentry into the workplace, as well as the interests of the employer in limiting its ongoing worker’s compensation liability.
In 1982, the Legislature effectively displaced the common-law doctrine with the enactment of a statutory approach that drew heavily upon the favored-work doctrine[3] (now called “reasonable employment”).[4] Importantly, the legislation stated that, as a prerequisite to being considered a participant in rea *149 sonable employment (MCL 418.301 [5])[5] an employee must first suffer a “disability,” as defined in MCL 418.301(4).[6] Because an employee engaged in reasonable employment is afforded significant statutory pro *150 tections[7] once the reasonable employment commences, it is critical to employers and employees alike that it be clear which workers are considered disabled under § 301(4). It is this condition precedent to “reasonable employment” — disability—that is the central issue in this case.
B
Plaintiff, Charles Sington, was employed by defendant, Chiysler Corporation, from July 1971 until March 1997. During his last fifteen years, he performed various production-related jobs as a “floater.” Until he was injured, plaintiff’s physical activities in the course of his employment included reaching and stretching out above head level, and bending and picking up parts weighing up to thirty pounds.
In June 1994, plaintiff slipped and fell at work, injuring his left shoulder. It is undisputed that the 1994 injury arose in the course of his employment and that defendant voluntarily paid wage loss benefits following that injury. Plaintiff underwent surgery on his left shoulder. Upon returning to work in January 1995, he was restricted from performing work requiring him to reach above the left shoulder. He continued working as a floater with this work restriction until his right shoulder was injured outside his employment. Plaintiff underwent surgery on his right shoulder in August 1996 for a non-work-related injury *151 and was off work until November 1996 when he returned to work as a floater. Defendant then honored plaintiff’s expanded work restrictions that precluded him from lifting, pushing, or pulling over twenty pounds. It is uncontested that plaintiff’s average weekly wage was the same before and after both the shoulder injuries.
Plaintiff continued as a floater until March 1997 when he suffered a non-work-related stroke. After the stroke, plaintiff received sickness and accident benefits and was then granted a permanent and total disability pension by defendant.
Thereafter, plaintiff sought worker’s compensation benefits related to his inability to work. Plaintiff asserted that he was working in “reasonable employment” under the WDCA when he performed his job with a work restriction after the left shoulder injury, and that he became entitled to worker’s compensation benefits when he lost this reasonable employment because of the stroke. This claim is grounded in the interaction between § 301(4) and § 301(5). As mentioned earlier, note 5, if an employee is disabled under § 301(4) and then is afforded reasonable employment under § 301(5), should that employment be terminated before one hundred weeks pass, the employee receives worker’s compensation benefits on the basis of the wage at the date of injury under § 301(5)(e). If, on the other hand, one hundred or more weeks have passed and the worker loses the employment through no fault of his own, eligibility for benefits is determined under § 301(5)(d).
While, in this case, no one disagrees with the rules of reasonable employment, there is dispute over whether plaintiff was “disabled” under § 301(4). Plaintiff asserts he was disabled because his left shoulder *152 injury precluded him from performing all the tasks he performed as a “floater” before that injury. Defendant’s position is that, before the stroke, plaintiff was not disabled because the left shoulder injury had not reduced his “wage earning capacity” as that is understood in § 301(4), and, thus, once returned to work, plaintiff was not engaged in reasonable employment, with all its attendant benefits, at the time of the stroke. Accordingly, defendant asserts that, as with any other employee who became unable to work because of a non-job-related injury, plaintiff has no remedy in the worker’s compensation system.
Faced with the question whether plaintiff was disabled under § 301(4), the worker’s compensation magistrate ruled that plaintiff was not engaged in reasonable employment under § 301(5). The magistrate opined that plaintiff had been “performing a regular plant job” after his left shoulder injury and that he was convinced that plaintiff “did not experience any wage loss, whatsoever” because of that injury. The magistrate further concluded that plaintiff was disabled because of his non-work-related stroke and that, but for the stroke, plaintiff “would have continued at his regular job, a job which was conveniently within his recommended restrictions.” Because plaintiff’s wage loss was attributable to his stroke rather than his shoulder injury, “his partial disability, based on his . . . workplace injury, [was] not compensable
The WCAC affirmed the magistrate’s decision. It concluded that the factual record supported the magistrate’s determination that plaintiff was performing his “regular job” when he returned to work after the left shoulder injury. Thus, the WCAC stated, the job “did not constitute an accommodation of [plaintiff’s] in *153 jury, so as to be ‘reasonable employment’ under Section 301(5).” Accordingly, the wcac further stated that plaintiff did not have a compensable disability when he continued to “perform his regular job” for defendant after his left shoulder injury because “it was the stroke which clearly and directly was the reason for his subsequent wage loss.”
The Court of Appeals reversed the wcac. 245 Mich App 535; 630 NW2d 337 (2001). The panel held “as a matter of law that defendant offered plaintiff ‘reasonable employment’ within the meaning of” MCL 418.301(9). Id. at 552. It further concluded that, once an injured employee is engaged in reasonable employment, the specific provisions pertaining to reasonable employment found in § 301(5)(e) take precedence over the general requirement of Haske that, to be compensable, wage loss must be causally linked to work-related injury. Thus, the Court concluded that plaintiff was engaged in reasonable employment at the time of the stroke. Thereafter, we granted defendant’s application for leave to appeal.
Critical to the proper resolution of this appeal is how “disability” is defined in the WDCA, MCL 418.301(4). In Haske, this Court adopted an interpretation of “disability” that encompassed any work-related injury that renders an employee unable to do one or more particular jobs within the employee’s qualifications and training. Because plaintiff in this case had to be accommodated to some degree in his “floater” position, it can be argued that, under the Haske definition, plaintiff was working at — and “disabled” from — a different job before his left shoulder injury than the reconfigured “floater” job to which he returned after his injury. Thus, when he suffered the stroke, as an employee entitled to reasonable employ- *154 merit status, plaintiff could claim the benefits that flow to an employee performing reasonable employment who, through no fault of his own, loses his ability to continue to perform reasonable employment.[8]
An alternative view of disability advanced by defendant requires a reduction in an employee’s actual wage earning capacity in all work suitable to his qualifications and training. Under this approach, an employee would not be disabled if a work-related injury rendered him unable to perform a particular job, but where that limitation did not affect the wages that he could earn. In particular, with regard to plaintiff, defendant argues that, if one examines overall wage earning capacity, plaintiff was not disabled because his postinjury work as a floater caused him no reduction in wage earning capacity. Thus, he was not entitled to be considered a participant in reasonable employment at the time of the stroke and, because the stroke was not work related, he is not entitled to benefits under § 301(5).
n
We review questions of law in final orders from the WCAC de novo. DiBenedetto v West Shore Hosp, 461 Mich 394, 401; 605 NW2d 300 (2000).
*155 in
A
We begin our analysis with the definition of “disability” in the WDCA:
As used in this chapter, “disability” means a limitation of an employee’s wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss. [MCL 418.301(4).]
As this language plainly expresses, a “disability” is, in relevant part, a limitation in “wage earning capacity” in work suitable to an employee’s qualifications and training. The pertinent definition of “capacity” in a common dictionary is “maximum output or producing ability.” Webster’s New World Dictionary (3d College ed). Accordingly, the plain language of MCL 418.301(4) indicates that a person suffers a disability if an injury covered under the WDCA results in a reduction of that person’s maximum reasonable wage earning ability in work suitable to that person’s qualifications and training.
So understood, a condition that rendered an employee unable to perform a job paying the maximum salary, given the employee’s qualifications and training, but leaving the employee free to perform an equally well-paying position suitable to his qualifications and training would not constitute a disability.[9]
*156 Our analysis in this regard is consistent with the following conclusion of this Court in Rea v Regency Olds/Mazda/Volvo, 450 Mich 1201; 536 NW2d 542 (1995):
A majority of the Court is of the opinion that the 1987 definition of disability in the Worker’s Disability Compensation Act[10] requires a claimant to demonstrate how a physical limitation affects wage-earning capacity in work suitable to the claimant’s qualifications and training. It is not enough for the claimant claiming partial disability to show an inability to return to the same or similar work. If the claimant’s physical limitation does not affect the ability to earn *157 wages in work in which the claimant is qualified and trained, the claimant is not disabled.
The Rea formulation implicitly drew upon an earlier articulation on this topic in Pulley v Detroit Engineering & Machine Co, 378 Mich 418, 423; 145 NW2d 40 (1966), in which this Court stated:
[T]he method of determining the employee’s earning capacity, as that term is used in the act, is a complex of fact issues which are concerned with the nature of the work performed and the continuing availability of work of that kind, and the nature and extent of the disability and the wages earned.
While we recognize that Pulley was decided before the adoption of the current definition of “disability” in § 301(4) and, thus, some particulars of that opinion may not be controlling with regard to the current statutory scheme, we believe that this language is instructive in indicating that worker’s compensation magistrates and the WCAC may have to consider various factual matters in determining whether an employee is disabled. Such matters could include the particular work that an employee is both trained and qualified to perform, whether there continues to be a substantial job market for such work, and the wages typically earned for such employment in comparison to the employee’s wage at the time of the work-related injury. If the employee is no longer able to perform any of the jobs that pay the maximum wages, given the employee’s training and qualifications, a disability has been established under § 301(4).
Under the Pulley and Rea approach, rather than concluding that any employee who is unable to perform a single job because of a work-related injury has *158 a “disability” under § 301(4), a worker’s compensation magistrate or the wcac should consider whether the injury has actually resulted in a loss of wage earning capacity in work suitable to the employee’s training and qualifications in the ordinary job market.
In sum, we conclude, as did the Rea Court before us, that “disability” as defined in MCL 418.301(4) cannot plausibly be read as describing an employee who is unable to perform one particular job because of a work-related injury, but who suffers no reduction in wage earning capacity.
B
This conclusion stands in contrast to the one the Haske majority reached. In Haske, supra at 634, this Court concluded that § 301(4) defined disability as “a personal injury or work-related disease that prevents an employee from performing any work, even a single job, within his qualifications and training . . . .” Because of the words the Legislature used in § 301(4), the Haske definition of disability is untenable. The plain meaning of the definition of “disability” in § 301(4) as “a limitation of an employee’s wage earning capacity in work suitable to his qualifications and training” precludes regarding a person as disabled when an inability to perform one particular job does not, in fact, reduce that person’s wage earning capacity in other, equally well-paying work suitable to his qualifications and training. Section 301(4) specifically directs the reader to a consideration of whether there is a limitation in wage earning capacity, not of whether a person is merely limited in performing one (or more) particular jobs.
*159 In this regard, Justice Weaver astutely observed in her partial dissent in Haske:
I believe that the most basic interpretation of “wage earning capacity” is that it describes an employee’s ability to earn wages. Perhaps because an employee is theoretically able to earn wages in a great variety of ways, the Legislature restricted consideration to “work suitable to [an employee’s] qualifications and training.” Where an employee is qualified and trained in more than one job, then his wage-earning capacity includes consideration of all those jobs under the plain meaning of subsection 301(4). Whether “a limitation” exists in an individual’s “wage earning capacity” where that individual is qualified and trained in more than one job therefore requires consideration of the effect of the work-related disease or injury on earning capacity in all those jobs in which the individual is qualified and trained. The statute does not state or imply that inability to perform one job within the individual’s qualifications and training necessarily results in “a limitation [in] wage earning capacity.” Thus, I cannot agree with the majority’s conclusion that “an employee is disabled if there is at least a single job within his qualifications and training that he can no longer perform.” I believe the majority’s conclusion fails to consider whether the overall wage-earning capacity of the individual was actually limited and, therefore, is not true to the plain language of subsection 301(4). [Haske, supra at 668 (Weaver, J., concurring in part and dissenting in part) (first emphasis in original, second emphasis added; citation omitted).]
We agree with Justice Weaver that the language of § 301(4) requires a determination of overall, or in other words, maximum, wage earning capacity in all jobs suitable to an injured employee’s qualifications and training.
We recognize that the Haske majority placed substantial reliance on the second sentence of § 301(4), which states that “[t]he establishment of disability *160 does not create a presumption of wage loss.” The Haske majority stated that this sentence “eliminates the possibility that disability and wage loss are defined the same way . . . .” Haske, supra at 654-655. Apparently, the concern of the Haske majority was that there would be no distinction between “wage loss” and “disability” if a showing of disability required an overall limitation in “wage earning capacity” in all work suitable to an employee’s qualifications and training. That is, the Haske majority was concerned that reading the first sentence in accordance with its plain meaning would render the second sentence nugatory.
However, we do not believe that this concern was justified. As an initial matter, the focus of the inquiry is not on every single job suitable to an employee’s qualifications and training — only those that produce the maximum income. Further, the second sentence reflects an understanding that there may be circumstances in which an employee, despite suffering a work-related injury that reduces wage earning capacity, does not suffer wage loss.[11] For example, an employee might suffer a serious work-related injury on the last day before the employee was scheduled to retire with a firm intention to never work again. In such a circumstance, the employee would have suffered a disability, i.e., a reduction in wage earning capacity, but no wage loss because, even if the injury *161 had not occurred, the employee would not have earned any further wages.
In light of the inconsistency of Haske with the plain language of § 301(4), we overrule it and return to the rule established in Rea, which was harmonious with the language of the statute.
c
In overruling the Haske interpretation of disability, we return to the proper understanding of disability in case law that preceded Haske and that, in our judgment, was more faithful to the wdca’s statutory language.
We recognize that following prior decisions of this Court under the doctrine of stare decisis is generally the preferred course of action “ ‘because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.’ ” Robinson v Detroit, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting Hohn v United States, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). Nevertheless, stare decisis is “not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes.” Robinson, supra at 463. Rather, it is “ ‘our duty to re-examine a precedent where its reasoning ... is fairly called into question.’ ” Id. at 464, quoting Mitchell v WT Grant Co, 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d 406 (1974) (Powell, J., concurring). In the present case, the treatment of the term “disability” as used in *162 § 301(4) of the WDCA has been fairly called into question.
In considering whether to overrule a prior decision of this Court, the first inquiry, of course, is whether that prior decision was wrongly decided. Robertson v DaimlerChrysler Corp, 465 Mich 732, 757; 641 NW2d 567 (2002); Robinson, supra at 464. For the reasons we have previously discussed, Haske was wrongly decided because it is clearly inconsistent with the plain language of the definition of “disability” in § 301(4).
Nevertheless, as we recognized in Robinson, that a prior case was wrongly decided “does not mean overruling it is invariably appropriate.” Robinson, supra at 465. We must consider whether overruling a prior erroneous decision would work an undue hardship because of reliance interests or expectations and, conversely, whether the prior decision defies “practical workability.” Robertson, supra at 757; Robinson, supra at 466. In particular,
the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone’s expectations that to change it would produce not just readjustments, but practical real-world dislocations. It is in practice a prudential judgment for a court. [Id,.]
In the present case, we see no significant reliance interest or expectation that will be disrupted by overruling Haske. Obviously, a work-related injury potentially compensable under the worker’s compensation system is an unexpected event, so it is difficult to imagine actions that an employee would take in reliance on Haske. Moreover, it is doubtful that there could be a legitimate expectation interest in receiving *163 worker’s compensation wage loss benefits on the basis of an earlier work-related injury that did not, in fact, result in any overall reduction in wage earning capacity in work suitable to one’s qualifications and training. Also, while a less significant factor, we see reason for concern about the “practical workability” of Haske, particularly in terms of deciding what constitutes a single job for the purpose of applying that decision.
Further, it is particularly appropriate to overrule a prior erroneous decision of this Court that has failed to apply the plain language of a statute. As we observed in Robinson, supra at 467, “it is to the words of the statute itself that a citizen first looks for guidance in directing his actions.” Indeed, when a court confounds the legitimate expectations of a citizen by misreading a statute, “it is that court itself that has disrupted the reliance interest.” Id. As we observed in Robertson, supra at 756, the values underlying general respect for stare decisis are also enhanced “by a legal regime in which the public may read the plain words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers.” Because Haske failed to apply the plain language of the definition of “disability” in § 301(4), and in light of the lack of a significant reliance interest in the Haske decision, we are impelled to overrule it.
IV
In our order granting leave to appeal in this case, we further directed the parties to address “whether Haske . . . and Powell v Casco Nelmor Corp, 406 Mich 332[; 279 NW2d 769] (1979), are reconcilable.” 465 *164 Mich 943 (2002). However, in light of our determination that the Haske definition of disability is erroneous and should be overruled, it is no longer necessary to consider whether Haske and Powell may be reconciled.
Moreover, Powell was decided under the old common-law “favored work” doctrine, before that doctrine was effectively codified by the Legislature in the wdca in its “reasonable employment” provisions. Codification of common-law rules makes those rules of no consequence if they are inconsistent with the codification. In Perez v Keeler Brass Co, 461 Mich 602, 606; 608 NW2d 45 (2000), we discussed the effect of codification on common-law rules regarding favored work:
Subsection (5) [of the wdca, related to reasonable employment] was added to the statute in 1982. Before that time, the statute did not address “reasonable employment,” and this issue was governed by an area of the common law known as the “favored-work doctrine.” Now, however, the quoted statutory provisions establish the law in this area. The Legislature chose the words of the statute, and we are bound by them. Any cases decided under the common law before subsection (5) was enacted are essentially irrelevant; to the extent that the common-law favored work doctrine is inconsistent with the plain language of the statute, the Legislature has changed the common law. [Citations omitted.]
Accordingly, in considering whether a person who has ceased working in a “reasonable employment” position is entitled to worker’s compensation wage loss benefits, worker’s compensation magistrates and the wcac should examine the provisions of MCL 418.301(5)(d) and (e), rather than decisions under the old common-law favored work doctrine such as Pow *165 ell. In short, as Perez indicates, Powell is now “essentially irrelevant.”
v
We now turn to the circumstances of this case. Plaintiff was qualified and trained as a “floater,” although there is no indication in the record regarding whether plaintiff was qualified and trained in any other jobs. To illustrate the application of our analysis, we will assume for the moment that plaintiffs job as a floater produced the maximum wages in work suitable to plaintiffs qualifications and training, although the wcac on remand may find otherwise. Plaintiff was evidently able to. perform a variety of production-related tasks as a “floater.” His physical restriction after his left shoulder injury that precluded him from lifting above shoulder level is the only relevant restriction because the right shoulder injury was not work-related. In order to establish that he had a “disability” because of the left shoulder injury, plaintiff had to show that that injury resulted in a limitation in his wage earning capacity in work suitable to his qualifications and training.
The magistrate and wcac did not apply this test. Rather, they focused, pursuant to Haske, on the fact that plaintiff was working in a “regular job” after his left shoulder injury. While that may be a strong indication that the left shoulder injury did not amount to a disability, it is not, standing alone, dispositive. An inquiry must be made regarding whether the “regular job” was suitable to plaintiffs qualifications and training at the time of the injury. Also, if plaintiffs injuries only enabled him to perform that “regular job” because of accommodations provided by defendant, *166 Ms wage earning capacity might be less than Ms actual wages.[12] Accordingly, we conclude that this case should be remanded to the wcac for reconsideration in accordance with tMs opimon.
VI
Justice Kelly’s dissent merits a response. As Justice Kelly has pointed out, in the last three and a half years, there have been cases overruling past precedent of tMs Court. She cites sixteen.[13] These should be seen in the context of the overall number of dispositions by tMs Court during the same period. From January 1, 1999 to June 30, 2002, there were 8,198 dispositions by tMs Court.[14] Thus, it is rare (in fact, a frequency of under one-fifth of one percent) when precedent is overturned, but it does sometimes happen. During tMs period, the issue of treatment of prece *167 dent has arisen primarily in review of earlier Supreme Court cases interpreting statutes. In fact, of the cases that Justice Kelly has cited where precedent has been overruled, eleven are within this category.[15] As the dissents to these actions have been forceful, so as to inform as to the doctrine of stare decisis and its limits, this Court in Robinson chose to discuss the doctrine in depth as well as its proper application.
Repeatedly, since Robinson was decided, the rules established in that case, which it should be noted are themselves entitled to respect as precedents of this Court, have been disregarded in dissents authored by Justice Kelly without any indication of what part of the rules set forth in Robinson she would alter.[16] Even more consequentially, she has failed to make clear what rules, if any, she would follow in determining when to affirm or reject precedents. What is it, for example, that distinguishes Lesner v Liquid Disposal, Inc 466 Mich 95; 643 NW2d 553 (2002), in which Justice Kelly would overrule an interpretation of a statute, from those cases in which she would not? Today, however, she has apparently set down her rules, and that is to be welcomed. She appears to approve the Robinson standard that stare decisis should not be *168 applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes. As to implementing this approach, the Robinson test asserts that it is a supreme court’s duty to reexamine a precedent where its reasoning is fairly called into question or, to put it more simply, when it is wrong. Justice Kelly differs in this regard, however, because, as we understand her position, she would not reexamine a precedent unless the prior decision was “utterly nonsensical,” post at 184, n 9, or reflected a “drastic error,” post at 184. Otherwise, she would allow that which even she would concede to be erroneous interpretations of the law to prevail.
Further, under Robinson, if the prior Court decided wrongly, that was not the end of the stare decisis inquiry, because the Court must also consider whether there are reliance interests such that, to overrule the prior case, would produce real world dislocations. Id. at 466. If that were so, then even though a case had been decided incorrectly, stare decisis should be respected and the case should not be overruled. As to this point, Justice Kelly would seem to agree, more or less, as she states in her dissent that she would determine if customs had changed or there were unforeseen practices. Post at 184.
These, then, are the differences between the Robinson approach and Justice Kelly’s approach. Robinson would allow the overruling of a prior case interpreting a statute if it was wrong unless there were reliance interests so great that overruling the prior decision would produce real world dislocations. Justice Kelly, on the other hand, would not overrule such a decision unless the earlier Court was not merely in *169 error, but “drastically” in error, or had rendered a decision that was nonsensical. If so, then Justice Kelly would examine customs and unforeseen practices to determine if overruling was appropriate.
She claims, correctly we acknowledge, that her approach, as contrasted with the Robinson approach, would likely produce fewer cases overruling precedent. Yet, is that the proper measure of the merits of these two approaches? We think not.
We think not because the proper measure of tests of stare decisis is not whether one approach overrules more than another, but rather which approach is more consistent with American constitutionalism. We believe the constitutional arrangement in our state and nation reposes in the legislative body the role of making public policy. That arrangement is distorted when the judiciary misconstrues statutes. The majority’s view is that its approach to stare decisis, in overruling our prior erroneous interpretations of statutes, respects the democratic process by yielding to the constitutional authority of the Legislature its right to establish the state’s policy.
Justice Kelly’s approach is flawed because it gives the earlier Court and its judges far too much power— power beyond that which the constitution gave them. Nothing is clearer under our constitution than that the Legislature, when it has enacted a statute within its constitutional authority and, thus, has established public policy, must be obeyed even by the courts. Said more plainly, the difference in these approaches is that Justice Kelly feels less obligation to adhere to the direction of the people’s representatives in the Legislature, and more obligation to defend past judges’ errors. We respectfully believe that this *170 approach of Justice Kelly misunderstands who governs in a republic. It is not judges; rather, it is the people. In this case, we have restored the law to what was enacted by the people’s representatives. It is our duty to do so.
As to Justice Cavanagh’s criticism of our response to Justice Kelly, it is important that the reader understand that, in the ordinary course of things on an appellate court, majority opinions are written and then dissents follow. The majority then responds to the dissent. In the instant case, this was the pattern of things. To fully argue the approaches of Robinson and Justice Kelly is not unseemly nor does it indicate a “manic sensitivity to criticism.” Rather, to respond fully to a dissent indicates that the majority is sufficiently respectful of the dissent, and those who could be persuaded by it, to want to ensure that the issue is fully understood. Justice Cavanagh, on the occasions when he writes for the majority in the face of dissent, does no less — nor should he.[17] We claim the same prerogative when he is not in the majority.
On the merits of this case, that is whether Haske was wrong, we consider Justice Kelly’s critique of the majority opinion to be highly unconvincing. Contrary to the dissent’s position, there obviously is a distinction between “wages earned” and “wage earning *171 capacity.” See post at 181. It is simply inaccurate to state that “capacity to earn wages and wages earned will rarely differ.” Post at 181. On the contrary, it can clearly be the case that an individual might earn wages below his wage earning capacity. With regard to the second sentence of § 301(4), which establishes that disability does not create a presumption of wage loss, one likely explanation for this sentence is the provision of reasonable employment with full wages to an injured employee despite a reduction in wage earning capacity. That is, a person might suffer a disability under § 301(4), i.e., a reduction in wage earning capacity in work suitable to his qualifications and training, because of an inability to actually earn wages in the ordinary job market, but be paid full wages by an employer for the performance of reasonable employment. In such a situation, the employee would be “disabled,” but not suffer wage loss.
We are frankly at a loss to understand the distinction that Justice Kelly would draw between “wage earning capacity” and “earning capacity.” Post at 182. An employee earns wages for his work. We cannot see any sensible distinction between “wage earning” and “earning” in the present context, let alone what difference such a distinction makes to the practical application of the definition of “disability” in § 301(4). Similarly, we do not see the point of somehow attempting to equate the phraise “wage earner,” which refers to a person, with the phrase “wage earning,” which is used in § 301(4) as an adjectival phrase to modify the term “capacity” for the purpose of effectively concluding that disability requires a showing of only an inability to perform one particular job suitable to a person’s qualifications and training. Id.
*172 We emphatically disagree with Justice Kelly’s statement that “the proper definition of disability focuses on a limitation in the capacity to perform the work, not on a limitation in the capacity to earn wages . . . Post at 183 (emphases removed). While that might be a definition she would prefer, the plain language of § 301(4) defines “disability” as, in pertinent part, “a limitation of an employee’s wage earning capacity in work suitable to his or her qualifications and training” (emphasis added). Thus, a judicial “definition” of disability, such as the one in Haske, that does not focus on the employee’s capacity to earn wages, i.e., the employee’s wage earning capacity, is simply inconsistent with the plain language of the controlling statute.
vn
For these reasons, we overrule the Haske definition of “disability” as that term is used in MCL 418.301(4). Accordingly, we vacate the judgment of the Court of Appeals and remand this case to the WCAC for reconsideration consistent with this opinion.
Corrigan, C.J., and Young and Markman, JJ., concurred with Taylor, J.

 This Court described the former favored-work doctrine as follows:
The favored-work doctrine is a purely judicial creation. Favored, or light, work can be loosely defined as less strenuous post-injury work. Wages from favored work may be used as a setoff against an employer’s compensation liability, but favored-work wages do not establish an earning capacity, and when such wages cease, they neither suspend nor bar compensation.
The primary purpose of the doctrine is that of mitigation. It allows an employer to reduce or completely eliminate compensa *148 tion payments by providing work within the injured employee’s physical capacity. At the same time, it encourages the employee to return to productive employment rather than to remain idle, thus also serving a rehabilitative function. [Bower v Whitehall Leather Co, 412 Mich 172, 182; 312 NW2d 640 (1981) (citations omitted).]

 For example, reasonable employment in a “malee work” position not reflective of earning capacity in the ordinary job market could not be abused by an employer to “establish” a wage earning capacity to allow the employer to discharge the employee while escaping further liability for benefits. See Pulley v Detroit Engineering & Machine Co, 378 Mich 418; 145 NW2d 40 (1966).

 In particular, the Legislature made provisions, as set forth in n 5, providing generally for resumption of worker’s compensation benefits if an employee lost reasonable employment.

 The current version of the wdca provides the following definition of “reasonable employment”:
“Reasonable employment,” as used in this section, means work that is within the employee’s capacity to perform that poses no clear and proximate threat to that employee’s health and safety, and that is within a reasonable distance from that employee’s residence. The employee’s capacity to perform shall not be limited to jobs in work suitable to his or her qualifications and training. [MCL 418.301(9).]

 MCL 418.301(5), the reasonable employment section, provides:
If disability is established pursuant to subsection (4), entitlement to weekly wage loss benefits shall be determined pursuant to this section and as follows:
* * *
(d) If the employee, after having been employed pursuant to this subsection for 100 weeks or more loses his or her job through no fault of the employee, the employee shall receive compensation under this act pursuant to the following:
(i) If after exhaustion of unemployment benefit eligibility of an employee, a worker’s compensation magistrate or hearing referee, as applicable, determines for any employee covered under this subdivision, that the employments since the time of injury have not established a new wage earning capacity, the employee shall receive compensation based upon his or her wage at the original date of injury. There is a presumption of wage earning capacity established for employments totalling 250 weeks or more.
(ii) The employee must still be disabled as determined pursuant to subsection (4). If the employee is still disabled, he or she shall be entitled to wage loss benefits based on the difference between the normal and customary wages paid to those persons performing the same or similar employment, as determined at the time of termination of the employment of the employee, and the wages paid at the time of the injury.
(in) If the employee becomes reemployed and the employee is still disabled, he or she shall then receive wage loss benefits as provided in subdivision (b).
(e) If the employee, after having been employed pursuant to this subsection for less than 100 weeks loses his or her job for whatever reason, the employee shall receive compensation based upon his or her wage at the original date of injury.

 MCL 418.301(4) in full provides the following definition of “disability”:
As used in this chapter, “disability” means a limitation of an employee’s wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss.

 Section 301(5)(e) provides that, if reasonable employment is lost “for whatever reason” within one hundred weeks, the employee shall receive compensation on the basis of the employee’s wage when injured. Similarly, § 301(5)(d) generally provides for resumption of worker’s compensation benefits if reasonable employment is lost after one hundred weeks “through no fault of the employee.”

 It is not clear how many weeks plaintiff worked at what he alleged to be “reasonable employment” job. As indicated previously, if an employee loses reasonable employment “for whatever reason” within one hundred weeks, he is entitled to worker’s compensation benefits on the basis of his wage at the time of injury under § 301(5)(e). If one hundred or more weeks have passed, determination of eligibility for worker’s compensation benefits if an employee loses reasonable employment “through no fault of the employee” is based on the more complex factors set forth in § 301(5)(d).

 We recognize that pre-1987 Michigan case law once drew a distinction with regard to wage earning capacity between “skilled” and “unskilled” workers. A skilled worker was considered to have an impairment of earning capacity, and thus would be entitled to compensation, if a work-related injury rendered the employee unable to continue earning the same *156 level of wages in his particular skilled employment, even if the same wages could be earned at another type of employment. See, e.g., Kaarto v Calumet & Hecla, Inc, 367 Mich 128, 131; 116 NW2d 225 (1962); Geis v Packard Motor Car Co, 214 Mich 646, 648-649; 183 NW 916 (1921). Similarly, an unskilled or “common” laborer had to show a limitation in wage earning capacity in the entire field of “unskilled” labor. See Leitz v Labadie Ice Co, 229 Mich 381; 201 NW 485 (1924); Kling v Nat’l Candy Co, 212 Mich 159; 180 NW 431 (1920). This dichotomy between skilled and unskilled labor led to some anomalous results. In Geis, the plaintiff was held to have a compensable disability because of an injury that precluded him from performing the skilled employment he was performing at the time of his injury even though he worked for higher wages in somewhat related employment. See Kaarto, supra at 131 (discussing Geis). Conversely, in Leitz, the plaintiff was held entitled to continuation of a disability award on the basis of being disabled from common labor even though he was earning higher wages as a bookkeeper and accountant.
However, when the present definition of disability was adopted in 1987, the Legislature replaced its prior reference to a limitation in wage earning capacity in “the employee’s general field of employment” with “work suitable to his or her qualifications and training.” This means that the inquiry is now focused on an employee’s qualifications and training, not merely the general field of employment in which the employee happened to work at the time of a work-related injury. Thus, the prior common-law skilled/unskilled dichotomy has no significance under the current statutory language. Because there is no textual basis in the statute for the selection and application of either historical definition of “wage earning capacity,” we examine the plain meaning of the words found in the statute.

10 That is the current definition of disability in the wdca, MCL 418.301(4).

 We note that, once it is found that an employee is disabled under § 301(4), the employee must then establish wage loss in order to compute wage loss benefits under MCL 418.361. The clear language of the second sentence of § 301(4) militates against any holding that the terms “wage earning capacity” and “wage loss” are synonymous.

 However, a work-related injury that has a de minimus effect on an employee’s job-related duties might not amount to a disability. This is because many employers might disregard such minor limitations in hiring applicants generally, meaning that such minor conditions would not effect an employee’s ability to perform his top paying job and would therefore not limit his wage earning capacity. A useful perspective for the wcac in considering this case on remand might be considering whether plaintiffs injuries would prevent him from competing in the marketplace with other workers for the “regular job.” The wcac might also consider whether defendant would have continued plaintiff in the “regular job” at the same rate of pay if he was injured in a non-work-related incident. If plaintiff would have been hired or retained despite his ir\jury, this would indicate that plaintiff did not suffer a disability because the pertinent injury did not impair his wage earning capacity Conversely, if defendant would not have hired plaintiff or would not have accommodated plaintiffs injury except for it being work related, that would be indicative of a limitation in wage earning capacity.

 See post at 177, n 2.

 The Supreme Court Clerk’s data reflects that there were 2,571 dispositions in 1999, 2,302 in 2000, 2,359 in 2001, and 966 from January 1 to June 30, 2002. Dispositions include opinions of this Court, peremptory orders, dismissals, and denials of leave.

 People v Cornell, 466 Mich 335; 646 NW2d 127 (2002); Koontz v Ameritech Services, Inc, 466 Mich 304; 645 NW2d 34 (2002); Robertson, supra; Pohutski v City of Allen Park, 465 Mich 675; 641 NW2d 219 (2002); Hanson v Mecosta Co Rd Comm’rs, 465 Mich 492; 638 NW2d 396 (2002); Brown v Genesee Co Bd of Comm’rs, 464 Mich 430; 628 NW2d 471 (2001), People v Glass, 464 Mich 266; 627 NW2d 261 (2001); Nawrocki v Macomb Co Rd Comm, 463 Mich 143, 615 NW2d 702 (2000); Mudel v Great Atlantic & Pacific Tea Co, 462 Mich 691; 614 NW2d 607 (2000); Robinson, supra; People v Lukity, 460 Mich 484; 596 NW2d 607 (1999).

 See People v Hardiman, 466 Mich 417; 646 NW2d 158 (2002) (Kelly, J., dissenting); Cornell, supra (Kelly, J., dissenting); Pohutski, supra (Kelly, J., dissenting); Nawrocki, supra (Kelly, J., dissenting); Mudel, supra (Kelly, J., dissenting).

 The examples are many, but, to just take one from this term on the topic of departure from precedent, Justice Cavanagh authored the majority opinion in Allstate Ins Co v McCarn, 466 Mich 277, 284-291; 645 NW2d 20 (2002), in which I joined, and chose to respond, strongly, to the dissent.
Lest there be confusion that only Justice Cavanagh and I respond to dissents, see Justice Kelly’s defense of her majority in People v Randolph, 466 Mich 532; 648 NW2d 164 (2002). The truth is it is quite unusual for justices not to respond to dissents.