YOUNG, J.
(dissenting).
Evidently, the governing standard is to be what might be called the unfettered wisdom of a majority of this Court, *321 revealed to an obedient people on a case-by-case basis. This is not only not the government of laws that the Constitution established; it is not a government of laws at all.
—Antonin Scalia, in Morrison v Olson[1]
I agree entirely with Justice MARKMAN’s dissenting opinion in this case. I write separately only to note that, today, the decade-long shrill pretense of several of my colleagues’ adherence to “preserving precedent” is over. The concurring opinions of Justices WEAVER and Hathaway make clear that there is no longer any need for them to pretend that “precedent” is anything sacred for the “new majority” of this Court.[2] That mask has now been cast aside. After a decade of dissents in which Justices CAVANAGH, WEAVER, and KELLY played the recurrent theme that they were hawk-like adherents to stare decisis,[3] attacking the then majority — Justices TAYLOR, CORRIGAN, MARKMAN, and me — for failing to preserve cases with whose results *322 they agreed,[4] today precedent is no longer an “issue.” Nor is precedent now an issue for my newest colleague, Justice HATHAWAY, although her campaigns for election to the Court of Appeals and this Court featured prominently her position adamantly proclaiming an absolutist support for stare decisis.[5]
The new majority, being a majority, is now free to do as it pleases. And it pleases the new majority to honor the agenda to which our new Chief Justice pledged them after the defeat of Chief Justice TAYLOR in 2008:
*323 We the new majority [Chief Justice Kelly and Justices Cavanagh, Weaver, and Hathaway] will get the ship off the shoals and back on course, and we will undo a great deal of the damage that the Republican-dominated court has done. Not only will we not neglect our duties, we will not sleep on the bench.[6]
The new majority has not been shy about acting on its agenda to “undo” the precedents of the “Republican-dominated court.” In the 18 months of its existence, the new majority has moved muscularly in making good on this promise. Just in this term alone, the new majority has overturned the following cases recently decided by this Court:
1. In People v Feezel, 486 Mich 184; 783 NW2d 67 (2010), the new majority overruled People v Derror, 475 Mich 316; 715 NW2d 822 (2006).
2. In McCormick v Carrier, 487 Mich 180; 795 NW2d 517 (2010), the new majority overruled Kreiner v Fischer, 471 Mich 109; 683 NW2d 611 (2004).
In Lansing Sch Ed Ass’n v Lansing Bd of Ed, 487 Mich 349; 792 NW2d 686 (2010), the new majority overruled (at least) the following cases:
3. Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001);
4. Crawford v Dep’t of Civil Serv, 466 Mich 250; 645 NW2d 6 (2002);
5. Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004);
6. Associated Builders & Contractors v Dep’t of Consumer & Indus Servs Dir, 472 Mich 117; 693 NW2d 374 (2005);
7. Mich Chiropractic Council v Comm’r of the Office of Fin & Ins Servs, 475 Mich 363; 716 NW2d 561 (2006);
*324 8. Rohde v Ann Arbor Pub Sch, 479 Mich 336; 737 NW2d 158 (2007);
9. Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280; 737 NW2d 447 (2007); and
10. Manuel v Gill, 481 Mich 637; 753 NW2d 48 (2008).
11. In Bezeau v Palace Sports & Entertainment, Inc, 487 Mich 455; 795 NW2d 797 (2010), the new majority expressly overruled the limited retroactive effect of Karaczewski v Farbman Stein & Co, 478 Mich 28; 732 NW2d 56 (2007).
12. And in this case, the new majority now overrules Cameron v Auto Club Ins Ass’n, 476 Mich 55; 718 NW2d 784 (2006).
And this list is separate and distinct from those cases in which the new majority has ignored or otherwise failed to follow other recently decided precedents of this Court,[7] or *325 the case that the new majority implicitly overruled by enacting a contradictory court rule.[8] Several justices have even gone so far as to call into question the continued validity of precedents that are in no relevant way before the Court.[9] Indeed, by expressly overruling cases this term when, last term, it simply ignored or implicitly overruled them, the new majority has become more aggressive in achieving its policy agenda.
It is a touch more than ironic that Justices WEAVER and HATHAWAY now argue that well-established principles ' of stare decisis must give way to a justice’s subjective view of a case. This process produces a result whereby the parties and the public will never know what criteria or standards several justices on this Court will employ until after the decision has been made. This ad hoc, subjective process is the very antithesis of the “rule of law” and instead denotes a system hijacked by the concurring justices, who appear to be guided and constrained only by their personal beliefs. That stare decisis is a “principle of policy,” as Justice HATHAWAY repeats many times, does not mean that analysis of a case pursuant to the doctrine should be driven by each judge’s personal policy choices.[10] Nor does the fact that *326 stare decisis is a “principle of policy” mean that judges need not announce a fixed set of principles that will guide their decisions.[11] Yet this is precisely what char *327 acterizes Justices WEAVER and HATHAWAY’s unique brand of feckless jurisprudence announced today.
The rule of law, by definition, requires judges to decide cases on the basis of principles, announced in advance, rather than on a personal or subjective preference for or against a party before them. This ensures stability in the law despite the diversity of judges’ personal beliefs. Whether we, as judges, “like” the outcome is, quite simply, irrelevant to whether it reflects a correct conclusion of law. It is harrowing that Justices WEAVER and HATHAWAY either do not understand this concept or refuse to subscribe to it, preferring to base their decisions on subjective “policy consideration^]. ”
Finally, Chief Justice KELLY has tried on several occasions to explain away what she meant when she said the “new majority” would “undo . . . the damage [of] the Republican-dominated court,” as she again attempts today. Chief Justice KELLY finds it disquieting that I quote her remarks about the “new majority’s” agenda. She should. Her remarks are as disquieting as they are scurrilous. What is noteworthy is that Chief Justice Kelly has never repudiated what she said, apologized for it, or sufficiently explained why that statement doesn’t mean what it plainly says. Instead, she merely prefers that I not repeat it for reasons that are obvious to all. Rare is it that a judge publicly tells the public that she has an agenda and what it is. I am glad that the Chief Justice was so candid because everyone can examine her conduct in light of her statement. Her motivations for making this dreadful remark and whether her subsequent resolution of cases is consistent with her remark are questions for the public to decide.
*328 Moreover, after being the target of much arccivil criticism by then Justice KELLY over the years, I am nonplussed by the Chief Justice’s pique at the passion of my dissent and the tone in which I have expressed it. One need only review the Chief Justice’s dissenting opinions over the years to acknowledge that her views on civility have conveniently changed as quickly as the new majority’s view regarding the importance of preserving precedent.[12] Now that she is part of this Court’s *329 philosophical majority, her criticism of my impassioned tone recalls a line from Shakespeare: “The lady doth protest too much, methinks.”[13]
Moreover, the Chief Justice’s calls for civility are especially hypocritical given the very ugly reference she made to the false “sleeping judge” ads that played so prominent a role in the campaign to defeat Chief Justice TAYLOR in 2008. Given the context that this remark was made just after the defeat of Chief Justice TAYLOR in the last election, Chief Justice Kelly’s final comment that “we will not sleep on the bench” was a particularly uncivil reference denigrating our distinguished former colleague.[14] Chief Justice KELLY was present during the arguments of the case in which it was falsely asserted that Chief Justice TAYLOR fell asleep, and she knew, or should have known, that the claim was false. These facts are impossible to square with her current desire to improve civility among members of the Court.
*330 The public should be just as indignant as I am — not only regarding the hypocrisy of the new majority’s radically changing views on the question of preserving precedents, but also with its equally radically subjective approach to the law. I will continue to strive to bring such issues to the public’s attention. The public may judge whether the former majority’s or this new majority’s opinions provided greater predictability in the law and were more faithful to the actual language of the statutes, or whether the legislative “work product” was disregarded for the pet policies of the several justices who formed these respective majorities. Indeed, in a constitutional republic where judges are elected, it is the obligation of the public to do just that. Otherwise, for the foreseeable future, the public can look forward to more “damage control” in the form of brash judicial activism from the new majority.
Corrigan, J., concurred with Young, J.

 487 US 654, 712; 108 S Ct 2597; 101 L Ed 2d 569 (1988) (Scalia, J., dissenting).

 “New majority” is the self-description selected by Chief Justice Kelly. See text accompanying footnote 6 of this opinion.

 See, e.g., Pohutski v City of Allen Park, 465 Mich 675, 712; 641 NW2d 219 (2002) (Kelly, J., dissenting) (“[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable.”); People v Hawkins, 468 Mich 488, 517-518; 668 NW2d 602 (2003) (Cavanagh, J., dissenting) (“ ‘We have overruled our precedents when the intervening development of the law has “removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies.”... Absent those changes or compelling evidence bearing on Congress’ original intent... our system demands that we adhere to our prior interpretations of statutes.’ ”), quoting Neal v United States, 516 US 284, 295; 116 S Ct 763; 133 L Ed 2d 709 (1996), quoting Patterson v McLean Credit Union, 491 US 164, 173; 109 S Ct 2363; 105 L Ed 2d 132 (1989); Rowland v Washtenaw Co Rd Comm, 477 Mich 197, 278; 731 NW2d 41 (2007) (Cavanagh, J., dissenting) (“ ‘Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed.’ ”), *322 quoting People v Jamieson, 436 Mich 61, 79; 461 NW2d 884 (1990); Devillers v Auto Club Ins Ass’n, 473 Mich 562, 622; 702 NW2d 539 (2005) (Weaver, J., dissenting) (“Correction for correction’s sake does not make sense. The case has not been made why the Court should not adhere to the doctrine of stare decisis in this case.”).

 In addition to the vigorous responses to these charges that each justice — Taylor, Corrigan, Markman, and I — gave in our respective cases, Justice Markman has already explored, at great length, the general charge that the former majority was disrespectful of precedent. See Rowland, 477 Mich at 223-247 (Markman, J., concurring). His conclusions demonstrate quite the opposite: that while we did, in fact, overrule some prior cases, those precedents had either failed to follow even more established precedents from this Court or failed to accord the appropriate and text-based meaning to the words of this state’s statutes or constitution. Moreover, we specifically set forth a test explaining the explicit standards by which a case would be reviewed in determining whether overruling it would be appropriate. See Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000). Notably, this test is the only test to garner support from a majority of this Court, even though all members of the new majority now treat it, alternatively, as “one among many varying approaches,” ante at 316 or, worse still, not existent at all. See, e.g., Lansing Sch Ed Ass’n v Lansing Bd of Ed, 487 Mich 349; 792 NW2d 686 (2010). These standards stand in sharp contrast to the actions of the new majority and, in particular, the legal relativism espoused by the concurring opinions today

 Berg, Hathaway attacks, Michigan Lawyers Weekly, October 27, 2008 (“ ‘People need to know what the law is,’ Hathaway said. T believe in stare decisis. Something must be drastically wrong for the court to overrule.’ ”); Lawyers’ election guide: Judge Diane Marie Hathaway, Michigan Lawyers Weekly, October 30, 2006 (quoting Justice Hathaway, then running for a position on the Court of Appeals, as saying that “[t]oo many appellate decisions are being decided by judicial activists who are overturning precedent”).

6 She Said, Detroit Free Press, December 10, 2008, p 2A.

 See, e.g., Hardacre v Saginaw Vascular Servs, 483 Mich 918 (2009), in which the majority failed to follow Boodt v Borgess Med Ctr, 481 Mich 558; 751 NW2d 44 (2008); Sazima v Shepherd Bar & Restaurant, 483 Mich 924 (2009), in which it failed to follow Chrysler v Blue Arrow Transp Lines, 295 Mich 606; 295 NW 331 (1940), and Camburn v Northwest Sch Dist (After Remand), 459 Mich 471; 592 NW2d 46 (1999); Vanslembrouck v Halperin, 483 Mich 965 (2009), in which it failed to follow Vega v Lakeland Hosps, 479 Mich 243, 244-245; 736 NW2d 561 (2007); Juarez v Holbrook, 483 Mich 970 (2009), in which it failed to follow Smith v Khouri, 481 Mich 519; 751 NW2d 472 (2008); Beasley v Michigan, 483 Mich 1025 (2009), Chambers v Wayne Co Airport Auth, 483 Mich 1081 (2009), and Ward v Mich State Univ, 485 Mich 917 (2009), in which it failed to follow Rowland; Scott v State Farm Mut Auto Ins Co, 483 Mich 1032 (2009), in which it failed to follow Thornton v Allstate Ins Co, 425 Mich 643; 391 NW2d 320 (1986), and Putkamer v Transamerica Ins Corp of America, 454 Mich 626; 563 NW2d 683 (1997); and Potter v McLeary, 484 Mich 397; 774 NW2d 1 (2009), in which it failed to follow Roberts v Mecosta Co Gen Hosp (After Remand), 470 Mich 679; 684 NW2d 711 (2004).
From this term, see also Esselman v Garden City Hosp, 486 Mich 892 (2010) , in which it again failed to follow Roberts, 470 Mich 679.

 The new majority recently amended MCR 2.112 and MCR 2.118, and the amendment effectively overruled this Court’s precedent in Kirkaldy v Rim, 478 Mich 581; 734 NW2d 201 (2007). 485 Mich cclxxv, cclxxxi-ccxciii (order entered February 16, 2010) (dissenting statements of Corrigan, Young, and Markman, JJ.).

 See O’Neal v St John Hosp & Med Ctr, 487 Mich 485, 506 n 22; 791 NW2d 853 (2010) (opinion by Hathaway, J., joined by Weaver, J.) (calling into question the continued validity of Wickens v Oakwood Healthcare Sys, 465 Mich 53; 631 NW2d 686 [2001], regarding the doctrine of lost opportunity to survive, even though O’Neal in no way involved a claim for lost opportunity to survive).

 In particular, Justice Hathaway apparently fails to understand that stare decisis, even as a principle of judicial policy, does not equate with a judge making individual “policy determination[s],” ante at 316, as if she *326 were a citizen-legislator. As any student of the law can explain, her theory represents the precise opposite principle that governs courts in a society based on the rule of law. Judges serve an important yet limited role in a constitutional republic. Not being of the policy-making branches of government, they should never base their decisions on their own subjective policy beliefs. If nothing else, Justice Hathaway’s admission that she is making her own personal “policy determination]»” in cases at least provides a view into what has driven many of the decisions produced by the new majority.

 My criticism of Justice Weaver’s approach is not, as she alleges, that she has subscribed to a theory of stare decisis as an “inexorable command” that she now rejects. In fact, it is precisely the opposite: She often subscribes to no objective test whatsoever. Cases from time to time may need to be overruled, but the ultimate problem with Justice Weaver’s approach is that she relies on her subjective application of “judicial restraint, common sense, and a sense of fairness — justice for all,” rather than any defined legal standard in making these decisions. And unlike her prior protests that “[cjorrection for correction’s sake does not make sense,” Devillers, 473 Mich at 622, Justice Weaver is now working to “correct” and overrule as many recent precedents as possible. Worse still, she is content to do so without any serious stare decisis analysis as long as doing so does not offend her subjective “sense of fairness.” And, as the public is no doubt aware, “common sense” is not so common and Justice Weaver has no greater fund of common sense than anyone else. If for no other reason, that is why simply “following the law” is the best course for any serious jurist committed to the “rule of law” rather than the “rule of judges.”
Justice Weaver also selectively quotes without context a passage from an extended law review article that I authored. See Robert E Young, Jr., A judicial traditionalist confronts the common law, 8 Texas Rev L & Fol 299 (2004). The article was designed to highlight, in an arresting way, how difficult it should be for any judge committed to the rule of law to make the difficult policy choices necessary when modifying the common law. Quite simply, pohcy-making in the judiciary is one of least desirable and most difficult things for judges to do. This is because it is hard to assess the trade-offs that competing policies might create, especially when, unlike the Legislature, judges cannot consider the competing policy positions of interest groups affected by the issue in question. However, since Justice WEAVER is not committed to the rule of law, but instead applies her brand of “common sense,” she has no qualms with judicial policy-making in any context — common law or otherwise. This fact is attested to by her concur *327 rence here and illustrated in recent decisions handed down by the new majority that she has signed.

 See, e.g., People v Smith, 478 Mich 292, 331, 335 n 4, 339 n 13; 733 NW2d 351 (2007) (Kelly, J., dissenting) (accusing the majority of “again unnecessarily chip[ing] away at the Double Jeopardy Clause” and “mangling” double jeopardy jurisprudence and noting that “in its zeal, [the majority] will at times punish a defendant twice for the same offense”); Rowland, 477 Mich at 256-257 & n 13, 266 (Kelly, J,, concurring in part and dissenting in part) (“The majority has ordained itself master of such ‘higher law’ [i.e., law ‘ “manufactured for each special occasion out of our own private feelings and opinions” ’]. In doing so, it undermines the stability of Michigan’s courts and damages the integrity of the judicial process.”; among other charges, Justice Kelly also alleged that the majority had launched an “unprecedented attack on stare decisis,” was “overturning precedent will-nilly,” and “disrespected] ... past justices of the Michigan Supreme Court.”) (citation omitted); Rory v Continental Ins Co, 473 Mich 457, 492; 703 NW2d 23 (2005) (Kelly, J., dissenting) (“The majority’s decision constitutes a serious regression in Michigan law, and it gives new meaning to the term ‘judicial activism.’.. . [T]he majority [reaches an unnecessary issue], apparently using this dispute as a vehicle to reshape the law on adhesion contracts more closely to its own desires.”); People v Davis, 472 Mich 156, 190; 695 NW2d 45 (2005) (Kelly, J., dissenting) (“[The majority] destabilizes our state’s jurisprudence. It suggests to the public that the law is at the whim of whoever is sitting on the Supreme Court bench. Surely, it erodes the public’s confidence in our judicial system.”); Terrien v Zwit, 467 Mich 56, 92; 648 NW2d 602 (2002) (Kelly, J., dissenting) (characterizing the majority opinion as “the embodiment of judge-made law” because, to Justice Kelly, it “engrafts its own version of what the law should be” and “discard[s] the knowledge and wisdom of those who came before the current Court”); Sington v Chrysler Corp, 467 Mich 144, 179 n 8, 180, 184; 648 NW2d 624 (2002) (Kelly, J., dissenting) (characterizing her actions as “a matter of not falling prey to a zealot’s conviction that what has been done in the past by others has been simply wrong. .. .” “When a Court pays no more than *329 lip service to [stare decisis], the basic integrity of the legal system itself is shaken.... So it is that, in the history of this and of the vast majority of supreme courts across the land, overrulings of precedent are infrequent. Yet, quite the opposite is true of the present Michigan Supreme Court. It is for that reason that, the majority’s pronouncements to the contrary notwithstanding, one may wonder whether reasoned adherence to stare decisis may properly be considered a policy of this Court.”); Robinson, 462 Mich at 491 (Kelly, J., concurring in part and dissenting in part) (“The majority’s casual disregard for this Court’s past opinions suggests to future courts that they do the same and creates instability in the law of this state. The reasons proffered to overrule [the past precedents] are based solely on the majority’s subjective, contrived interpretation of the statutes involved.”).

 Shakespeare, Hamlet, act 3, sc 2 (Gertrude, Queen of Denmark).

 It is this context that makes her after-the-fact rationalization that she was merely being “metaphorical” hard to believe. The credibility of her explanation for this is a matter for the public to decide, as is the credibility of her explanation that her statement does not refer to a substantive agenda to overturn jurisprudence decided by the prior majority.