CAVANAGH, J.
(concurring in part and dissenting in part.) Today, a majority of this Court vacates the decision of the Workers’ Compensation Appellate Commission and remands this case for reconsideration in light of Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000). In doing so, the majority overrules Hagerman v Gencorp Automotive, 457 Mich 720; 579 NW2d 347 (1998). I firmly believe that Hagerman was properly decided and correctly interpreted the phrase “proximate cause” as it is used in MCL 418.375(2).[1] *526 Specifically, this Court correctly considered and rejected the interpretation adopted today; namely, use of the article “the” before the term “proximate cause” does not compel the conclusion that the phrase means sole cause. Hagerman, supra at 728-729. Further, this Court wisely reasoned that the interpretation adopted today would not only ignore the text of the statute, it would also be inconsistent with concurrent causation principles predating the enactment of MCL 418.375(2). Hagerman, supra at 729-734. Indeed, a sole proximate cause requirement would contradict the law’s longstanding recognition that there may be more than one proximate cause, and there is no evidence that the Legislature intended to deviate from this principle in MCL 418.375(2). Therefore, Hagerman correctly held that the current majority’s interpretation of MCL 418.375(2) has neither textual nor historical support. Instead, Hagerman held that death is within the range of compensable consequences if the injury was a substantial factor in the death, and such a determination will almost always depend on the facts presented in a given case. Hagerman, supra at 736. Accordingly, I must respectfully dissent from today’s decision.
Despite my disagreement with the majority’s interpretation of MCL 418.375(2) and its election to overrule Hagerman, I agree with the majority that the presumption of whole dependency applies if the child was less than 16 years old at the time of the employee’s death. MCL 418.331(b); Runnion v Speidel, 270 Mich 18; 257 NW 926 (1934).
I could take this opportunity to further explain why Hagerman was correctly decided and should not be *527 overruled. Specifically, I could dissect Hagerman and explain why a decision from this Court issued just eight years ago and examining the very same issue that is implicated in this case is now being improperly overruled. Further, similarly to how the majority crafts its opinion in this case, I suppose I could simply cut and paste the relevant portions of the Hagerman majority opinion in support of my view that Hagerman remains good law. Additionally, like the current majority does, I could quote at length from the dissents in Robinson to show why Hagerman was properly decided. But I believe that my views on this issue are well-documented, as are the majority’s views. Accordingly, such an approach would not add much, if any, value to our jurisprudence. In other words, simply rehashing the same differences of opinion that this Court detailed just eight and six years ago does not benefit the bench and bar in any meaningful way. And more importantly, this regurgitation process would still not truly answer the question at hand: Why is a decision of this Court issued just eight years earlier and involving the same issue now being overruled?
Unfortunately, today’s majority does not adequately answer that question. Instead, it is clear from today’s decision, as well as from Robinson and its progeny, that the current majority does not like Hagerman. But mere disagreement with a validly issued opinion of this Court has never served as a legitimate basis for overruling precedent. Something more has always been required. Robinson, supra at 464-465. And the generic justifications the majority provides do not satisfy the standard it set forth in Robinson for overruling precedent.[2] *528 Instead, the majority devotes considerable effort in explaining why it believes the Hagerman decision was wrong and in personally attacking me, but little attention is paid to carefully explaining why Hagerman defies practical workability, whether reliance interests on Hagerman weigh against overruling it, and whether there has been some legal or factual change that no longer makes Hagerman justifiable. See Robinson, supra at 464-466. This is both telling and troubling.
Under Robinson, before this Court can overrule established precedent, this Court must first decide whether the earlier decision was wrong. For the reasons stated earlier in this dissent, I believe that Hagerman was correctly decided. Nonetheless, the current majority disagrees. I must note, however, that apart from recycling Robinson and the Hagerman dissent, the majority does not set forth any new reasons why Hagerman was wrongly decided other than those that were expressly rejected in Hagerman. The majority is certainly permitted to reargue the merits of the Hagerman dissent in support of its conclusion that Hagerman was wrongly decided. And there is little doubt that the majority is entitled to its view. But again, under the doctrine of stare decisis and Robinson, merely believing that Hagerman was wrongly decided is an insufficient ground to overrule that decision. Other considerations must factor into the calculus. And in light of these other considerations, the majority has simply failed to satisfy the standard for overruling precedent. Therefore, regardless of whether this Court believes that Hagerman was correctly decided — like I do — or wrongly decided— *529 like the majority does — the doctrine of stare decisis prevents this Court from overruling Hagerman at this time.
For example, before this Court can overrule established precedent, this Court must also decide whether, apart from being wrongly decided, the earlier case defies practical workability. Here, the majority has not specifically demonstrated that Hagerman defies practical workability. Instead, the majority posits that Hagerman is unworkable because the majority believes Hagerman is inconsistent with the language of the statute. According to the majority, Hagerman is unworkable because a reader and a follower of the statute would not be behaving in accordance with the law because Hagerman rewrote MCL 418.375(2). But the majority’s rationale with respect to Hagerman’s workability really goes back to the majority’s belief that Hagerman was wrongly decided. Indeed, the majority has not demonstrated that injured employees, insurers, magistrates, or the Workers’ Compensation Appellate Commission — the primary readers and followers of the statute — have found Hagerman’s interpretation to be unworkable. Indeed, in this case, neither the magistrate nor the Workers’ Compensation Appellate Commission had any difficulty in applying Hagerman and concluding, on the basis of medical testimony, that the earlier heart attack proximately caused the death. Further, the majority’s logic also ignores the notion that Hagerman’s interpretation was, in fact, the rule of law, and that the Legislature did not amend the statute because it believed Hagerman proved to be unworkable. Therefore, because the majority’s rationale regarding Hagerman’s workability relates solely to its belief that Hagerman was wrongly decided, the majority has not satisfied the standard set forth in Robinson for overruling precedent.
*530 Under Robinson, this Court must also consider whether reliance interests would be misplaced and cause an undue hardship if established precedent was overruled. Here, the majority’s rationale regarding reliance interests is simply unpersuasive and does not satisfy the standard set forth in Robinson. The majority tells us that no reliance interests would be disturbed because injured workers, Randall Paige, and his counsel could not have feasibly relied on Hagerman, the controlling law at the time of this action. Such an assertion is preposterous because it suggests that injured workers and attorneys who practice in the area of workers’ compensation do not, and should not, rely on this Court’s interpretation of the Worker’s Disability Compensation Act, MCL 418.101 et seq. Moreover, such logic is inconsistent with the majority’s attempted rationale regarding Hagerman’s workability. Here, the majority attempts to claim that Hagerman is unworkable because people have a right to rely on the law; however, in its next breath, the majority posits that no reliance interest would be unsettled because people do not actually rely on the law.
Further, the majority also attempts to set forth a rather curious position lacking any legal foundation that “mere compliance with precedent” will never amount to a reliance interest. Rather, the majority posits that reliance interests are only considered where a “large number of persons,” “an entire class of individuals,” or “a great number of people” “attempt to conform their conduct to a certain norm.” Ante at 511-512. But the majority does not provide any standard for what is a “large number of persons,” “an entire class,” or “a great number of people.” Moreover, the majority theorizes that “mere compliance with precedent” is insufficient to affect reliance interests; rather, only where “a great number of people affirma *531 tively alter their behavior” will reliance interests be considered. Ante at 512 (emphasis in original). Yet the majority does not provide any guidance on what it is that distinguishes “mere compliance” from “affirmatively altering... behavior.” Nor does the majority explain why this distinction must pertain when this Court must decide whether to overrule precedent. Instead, the majority offers a standardless, arbitrary theory that lacks any principled legal basis. Because such a theory poses a serious threat to the jurisprudence of this Court, completely guts the test set forth by the majority in Robinson for overruling precedent, and invites abuse, such a theory is fundamentally flawed.
Worse still, the majority claims that no reliance interests would be unsettled because injured employees do not script their injuries and illnesses on the basis of the opinions of this Court. But such a claim is insulting to those who happen to be injured on the job, and it demonstrates that the majority’s rationale regarding the reliance placed on Hagerman starts from a faulty premise. Granted, workers do not choose to become injured or sick on the basis of the decisions of this Court. Getting hurt or sick is often not a choice; workers simply get injured or sick. But when a worker suffers an injury or illness arising out of and in the course of employment, that worker and his counsel then rightfully rely on the rule of law when deciding how to protect and pursue the worker’s rights. And the rule of law applicable at the time the worker in this case died was Hagerman. As a validly issued decision of this Court, Hagerman was the controlling law in this state. And a validly issued decision from this Court is only rendered “untenable” when it is properly overruled by this Court. Accordingly, Hagerman’s status was not precarious because Robinson did not expressly or im *532 plicitly overrule Hagerman.[3] Therefore, the majority’s rationale regarding the reliance interests placed on Hagerman does not satisfy the standard it set forth in Robinson.
Finally, before this Court can overrule established precedent, this Court must also decide whether changes in the law or facts no longer justify the earlier decision. Here, the majority simply concludes:
[W]e need not consider whether changes in the law and facts no longer justify Hagerman because Hagerman itself was never justified as it was a change in the law that this Court had the power, but not the authority, to make. It was not justified from its inception. \Ante at 513.]
Clearly, such an assertion completely ignores the standard for overruling precedent set forth in Robinson. And importantly, the majority’s rationale in this statement again reveals its belief that it can properly overrule Hagerman simply because it believes that Hagerman was wrongly decided. In other words, the majority does not feel the need to point to any special justification or change to support its election to overrule Hagerman. Perhaps that is because there has been no change in the law or the workers’ compensation landscape in the eight years since Hagerman was decided. The only *533 change has been the composition of this Court. And unfortunately, this is the only reasonable answer to the question why a decision from this Court decided just eight years earlier and involving the same issue is now being overruled. But make no mistake, this answer is alarming, and it has become increasingly common. See, e.g., Devillers v Auto Club Ins Ass’n, 473 Mich 562; 702 NW2d 539 (2005).
Granted, it is said that stare decisis is not “ ‘an inexorable command.’ ” Robinson, supra at 464 (citation omitted). And under some circumstances, overruling precedent may be unavoidably necessary. But “this Court has consistently opined that, absent the rarest circumstances, we should remain faithful to established precedent.” Brown v Manistee Co Rd Comm, 452 Mich 354, 365; 550 NW2d 215 (1996) (emphasis added). Moreover, this Court “ ‘will not overrule a decision deliberately made unless [it] is convinced not merely that the case was wrongly decided, but also that less injury would result from overruling than from following it.’ ” Id. (citation omitted). Thus, stare decisis is “ ‘the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.’ ” Robinson, supra at 463 (citation omitted).[4] *534 Here, overruling Hagerman does not advance any of these principles. In fact, just the opposite is true.
Again, the reasons the majority advances in support of overruling Hagerman are simply unpersuasive. As noted earlier, the current majority offers no new reasons why Hagerman was wrongly decided other than those duly considered and reasonably rejected in Hagerman.[5] So it cannot be said that overruling Hagerman contributes to the development of the law. Rather, overruling Hagerman in the manner employed today signals that any decision from this Court depends on and is only as strong as the Court’s composition. When those justices who were once in the minority find themselves in the majority, today’s decision gives those justices free license to vindicate their dissents and disregard the doctrine of stare decisis. There is nothing evenhanded or predictable in this approach. Nothing in such an approach fosters reliance on this Court’s deci *535 sions. And certainly such actions destroy the actual and perceived integrity of this Court. This Court — including its past, current, and future members — and the rule of law are entitled to more respect. The mere dislike of some justices on this Court of decisions rendered by justices who previously sat in their chairs does not constitute a sufficient ground under the law to disregard and overrule those past decisions.
Let me be perfectly clear. This dissent cannot properly be characterized as “sour grapes” simply because I believe that Hagerman was correctly decided and, importantly, should not be overruled. If that were true, I would be guilty of roughly the same sin as the majority. Nor can this dissent be appropriately labeled as an expression of how I would prefer MCL 418.375(2) to be interpreted. Even a casual reading of Hagerman refutes such a charge.[6]
Instead, this dissent is intended to highlight the rather unremarkable principle that this Court and the laws of this state are larger than any individual justice, justices, or “philosophy.” This dissent is also intended to urge the majority to follow the doctrine of stare decisis, a fundamental principle of our law. Further, this dissent is intended to observe that the doctrine of stare decisis is particularly strong in matters of statutory interpretation, like Hagerman, because if this Court previously interpreted a statute incorrectly, the Legislature can subsequently remedy that interpretation and fix the statute, which it has not done in this case. Moreover, this dissent is intended as a reminder that adherence to stare decisis in matters of statutory interpretation where the Legislature has not corrected the interpreta *536 tion respects principles of separation of powers, is consistent with the “judicial role,” and avoids arbitrariness. Finally, this dissent is intended to highlight the principle that the rule of law also includes this Court’s precedent. Sadly, these principles remain a mystery to the current Court, and the underlying debate involving these principles has been going on for some time. See, e.g., Robertson v DaimlerChrysler, 465 Mich 732; 641 NW2d 567 (2002).
Nonetheless, the majority completely misses the point of this dissent. Rather than adequately explaining why stare decisis is being ignored in this case— the point raised by this dissent — the majority seeks to blur what this case is truly about. In doing so, the majority confuses the legal issues and simultaneously attempts to silence those who disagree. But once the histrionics are peeled away, the pretense of the majority’s decision in this particular case is evident.
For example, the majority speaks of consistency and predictability. But again, the majority does not adequately explain why it disregards the doctrine of stare decisis — a doctrine that is fundamentally based on consistency and predictability. Accordingly, what the majority professes to be a basis for its “philosophy” is at odds with what the majority is actually doing in this particular case. Moreover, the majority speaks of constitutional usurpation and separation of powers. But again, the majority does not adequately explain why it disregards the doctrine of stare decisis in a matter of statutory interpretation when the Legislature itself has not seen fit in eight years to correct Hagerman’s allegedly incorrect interpretation. Therefore, the majority’s rhetoric concerning public policy is at odds with what the majority is actually doing in this particular *537 case — making a policy choice for the Legislature and the people.[7]
In matters of stare decisis, Justice Black summed up his own views on the issue in his dissent in Boys Markets, Inc v Retail Clerks Union, Local 770, 398 US 235, 257-258; 90 S Ct 1583; 26 L Ed 2d 199 (1970). And while it is unnecessary to adopt Justice Black’s views for Michigan law, his views, and the underlying principles, are at least worthy of consideration. Justice Black observed:
In the ordinary case, considerations of certainty and the equal treatment of similarly situated litigants will provide a strong incentive to adhere to precedent.
When this Court is interpreting a statute, however, an additional factor must be weighed in the balance. It is the deference that this Court owes to the primary responsibility of the legislature in the making of laws. Of course, when this Court first interprets a statute, then the statute becomes what this Court has said it is. Such an initial interpretation is proper, and unavoidable, in any system in which courts have the task of applying general statutes in a multitude of situations. The Court undertakes the task of interpretation, however, not because the Court has any special ability to fathom the intent of Congress, but rather because interpretation is unavoidable in the decision of the case before it. When the law has been settled by an earlier case then any subsequent “reinterpretation” of the statute is gratuitous and neither more nor less than an amendment: it is no different in effect from a judicial alteration of language that Congress itself placed in the statute.
*538 Altering the important provisions of a statute is a legislative function. And the Constitution states simply and unequivocally: “All legislative Powers herein granted shall be vested in a Congress of the United States ....” It is the Congress, not this Court, that responds to the pressures of political groups, pressures entirely proper in a free society.... This Court should, therefore, interject itself as little as possible into the law-making and law-changing process. Having given our view on the meaning of a statute, our task is concluded, absent extraordinary circumstances. When the Court changes its mind years later, simply because the judges have changed, in my judgment, it takes upon itself the function of the legislature. [Id. at 257-258 (Black, J., dissenting) (emphasis added; citations omitted).][8]
*540 Yet in light of the points raised by this dissent, at its basic core, the majority nevertheless tells the people of this state that its “philosophy” and “preferences” should control the outcome of a given case. But the rule of law and the facts of the case should control the outcome, not any “philosophy.” In matters of statutory interpretation, I have never wavered from the principle that a plain and unambiguous statute is to be applied as written. Under some circumstances, however, a statute may be unclear or ambiguous, which is likely to happen in cases reaching the highest Court in this state. As such, when a statute is unclear, then well-established, centuries-old rules of construction often come into play and may help this Court resolve the controversy and determine the Legislature’s intent.
Accordingly, I encourage readers to examine the sampling of cases that the majority sets forth and judge my fidelity for themselves. See ante at 515 nn 26-29. For example, sometimes a statute is plain and unambiguous; therefore, the judge applies the statute as written. People v Barbee, 470 Mich 283; 681 NW2d 348 (2004); Title Office, Inc v Van Buren Co Treasurer, 469 Mich 516; 676 NW2d 207 (2004); Stanton v City of Battle Creek, 466 Mich 611; 647 NW2d 508 (2002); People v Stone, 463 Mich 558; 621 NW2d 702 (2001); In re MCI Telecom Complaint, 460 Mich 396; 596 NW2d 164 (1999); In re Wirsing, 456 Mich 467; 573 NW2d 51 (1998). Other times a statute may be ambiguous or unclear, and judicial construction then becomes necessary and the judge must “jump the textualist rails.” See, e.g., Lansing Mayor v Public Service Comm, 470 Mich 154, 174; 680 NW2d 840 (2004) (CAVANAGH, J., dissenting) (“I, on the other hand, believe that the statute is ambiguous and turn to legislative history accompanying the statute to discern the Legislature’s true intent.”). And other times principles of stare decisis in *541 matters of statutory interpretation, particularly where the Legislature has not responded to a prior interpretation, weigh against overruling precedent absent sound and specific justification. See, e.g., Devillers v Auto Club Ins Ass’n, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (CAVANAGH, J., dissenting); Neal v Wilkes, 470 Mich 661, 676-677; 685 NW2d 648 (2004) (CAVANAGH, J., dissenting); People v Moore, 470 Mich 56, 78-79; 679 NW2d 41 (2004) (CAVANAGH, J., dissenting); Jones v Dep’t of Corrections, 468 Mich 646, 665; 664 NW2d 717 (2003) (CAVANAGH, J., dissenting); Mack v Detroit, 467 Mich 186, 221-222; 649 NW2d 47 (2002) (CAVANAGH, J., dissenting); Robertson, supra at 767-768 (CAVANAGH, J., dissenting). Thus, I fail to see how these universally accepted legal principles are unsound, unpredictable, or unprincipled. Rather, I believe that the rule of law and the facts of the case should control the outcome, not ideology or “philosophy.” And if the majority wishes to characterize this in itself as a “philosophy” or “methodology,” so be it. But as the majority’s own rhetoric in this case shows, labels can be dangerous and are often misleading.
I have no doubt that the majority firmly believes that it dispenses justice and that its “philosophy” is the best means to this end and best serves the people of this state. But far too often the majority merely pays lip service to its stated “philosophy” or entirely misapplies it. For example, in cases involving issues of statutory interpretation, the majority and I often disagree whether a particular statute is ambiguous. But because there are two sound, reasonable interpretations based on the statutory language, this should signal that the statute may not be as clear as the majority purports it to be. See, e.g., Yellow Freight System, Inc v Michigan, 464 Mich 21; 627 NW2d 236 (2001), rev’d 537 US 36 (2002), vacated and remanded 468 Mich 862 (2003), on remand *542 257 Mich App 602; 669 NW2d 553 (2003). In any event, because it claims to abhor most well-accepted rules of statutory construction, the majority nonetheless is reluctant in some cases to find ambiguity or conclude that something is unclear. But no judge should ignore ambiguity when it is present merely to reach a given result, just as no judge should manufacture ambiguity.[9] Nonetheless, when in cases of statutory interpretation there is a basic, reasonable difference of opinion about whether language is ambiguous, the majority’s standard procedure is to vehemently claim a statute is plain and unambiguous, resort to numerous dictionary definitions, and accuse the dissenters and past justices of this Court of legislating from the bench, usurping the role of the Legislature, advancing their own policy preferences, or some combination of these accusations. This approach destroys the public’s confidence in this Court.
This case is a perfect example. The majority chooses to criticize me rather than respond and adequately *543 explain why Hagerman must be overruled under accepted principles of stare decisis. In turn, this case has become less about stare decisis and respect for precedent and more about giving the majority another opportunity to extol the virtues of its “philosophy” while simultaneously disregarding the principles that supposedly support its “philosophy,” as well as attacking those who disagree. This blurs what this case is really about: stare decisis and respect for precedent.
Further, I have no doubt that the majority truly believes that it is fixing what it perceives to be a wrong in this case. However, I believe that Hagerman was properly decided. Nonetheless, my disagreement on that point is not really the main thrust of this dissent. Father, this dissent is intended to observe that there are larger issues at stake in this case: the rule of law, respect for precedent, the integrity of this Court, and judicial restraint. Accordingly, larger institutional issues are implicated in this case.
This case, like all cases that come before this Court, should be about the rule of law, not ideology or partisanship. The cases this Court decides are not some sort of game or political football, complete with “regime[s],” “influence,” and “winner[s].” Ante at 520. Further, this Court must always be mindful that our decisions have real implications and affect real people. This Court must also be mindful that attacking sitting colleagues who happen to disagree, as well as attacking past justices — who cannot defend themselves — and characterizing them as inferior, “unpredictable,” and “inconsistent,” does an extreme disservice to this Court and the citizens of this state. Ante at 520. Such attacks are disrespectful. Such attacks are not robust legal debate by any definition. And such attacks and rhetoric wound this Court as an institution.
*544 Nonetheless, far too often, the members of the current majority prefer to attack and spin. Far too often, the members of the current majority use terms such as “textualism,” “judicial role,” “usurpation,” “separation of powers,” and “policy preferences” when conducting damage control and to mask the rationale of some of its opinions, not to mention the results of some of its opinions. When this occurs, members of this Court must voice their disagreement. And far too often, the majority will then elect to ignore the legal merits of any disagreement and, instead, choose to criticize the person who happens to disagree. But the majority is quite right that history, not me, will ultimately pass judgment on the current Court’s fidelity and jurisprudence.[10] Indeed, long after those in the current majority are gone, their decisions will remain. And I am sure it is their hope that when future members of this Court consider their body of work, those future justices will exercise more respect, wisdom, and restraint than the current majority has shown today.
KELLY, J., concurred with CAVANAGH, J.

 MCL 418.375(2) provides:
If the injury received by such employee was the proximate cause of his or her death, and the deceased employee leaves dependents, as hereinbefore specified, wholly or partially dependent on him or her for support, the death benefit shall he a sum sufficient, when added to the indemnity which at the time of death has been paid or becomes payable under the provisions of this act to the deceased employee, to make the total compensation for the injury and death exclusive of medical, surgical, hospital services, medicines, and rehabilitation services, and expenses furnished as provided in sections 315 and 319, equal to the full amount which such dependents would have been entitled to receive under the provisions of section 321, in case the injury had resulted in *526 immediate death. Such benefits shall be payable in the same manner as they would be payable under the provisions of section 321 had the injury resulted in immediate death.

 In Robinson, this Court observed that before established precedent is overruled, this Court must first decide whether (1) the earlier case was wrongly decided, (2) the earlier case defies practical workability, (3) *528 reliance interests would work an undue hardship if the earlier case was overruled, and (4) changes in the law or facts no longer justify the ear her decision. Robinson, supra at 464-465; see also Pohutski v City of Allen Park, 465 Mich 675, 694; 641 NW2d 219 (2002).

 In any event, Hagerman was allegedly rendered “untenable” and “inconsistent” by design. The author of the Hagerman dissent was given the opportunity to examine an arguably similar issue and pen Robinson. In doing so, the author relied on his Hagerman dissent. Still, Hagerman was not expressly or impliedly overruled. Yet the seed was planted, the instant defendant seized this opportunity, and the author of the Hagerman dissent has now been granted his wish. Under these circumstances, it cannot honestly be said that this case falls within the class of cases where it is this Court’s duty to reexamine precedent “ ‘ “where its reasoning... is fairly called into question.” ’ ” Sington v Chrysler Corp, 467 Mich 144, 161; 648 NW2d 624 (2002) (emphasis added; citations omitted). Rather, it was reasonable for the readers and followers of MCL 418.375(2) to rely on Hagerman until properly overruled.

 In its response to this dissent, the majority includes a citation to a text written by Chief Justice William H. Rehnquist. However, the majority would be well-advised to read more of the late chief justice’s jurisprudence, particularly his views on the doctrine of stare decisis. For example, it is no surprise that Chief Justice Rehnquist was highly critical of the constitutional rule announced in Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). See, e.g., Michigan v Jackson, 475 US 625, 637-642; 106 S Ct 1404; 89 L Ed 2d 631 (1986) (Rehnquist, J., dissenting). But Chief Justice Rehnquist was also the author of the Court’s decision that later reaffirmed Miranda. Dickerson v United States, 530 US 428; 120 S Ct 2326; 147 L Ed 2d 405 (2000). In Dickerson, Chief Justice Rehnquist wrote:
*534 Whether or not we would agree with Miranda’s reasoning and its resulting rule, were we addressing the issue in the first instance, the principles of stare decisis weigh heavily against overruling it now. While “ ‘stare decisis is not an inexorable command,’ ” particularly when we are interpreting the Constitution, “even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some ‘special justification.’ ” [Id. at 443 (citations omitted).]
As explained more fully earlier in this dissent, the majority in this case offers no “special justification” for overruling Hagerman other than its belief that it was wrongly decided. Therefore, the majority’s approach in this case appears inconsistent with the late chief justice’s views.

 The only new “analysis” set forth by the current majority involves its disapproval of what it considers so-called “preferential rules of construction.” Ante at 509. But I disagree with the views expressed in this discussion. In any event, the majority’s discussion of these “preferential rules of construction” does not even come close to establishing a legitimate, independent reason to overrule Hagerman.

 Interestingly, similar unfounded accusations were lodged by the Hagerman dissent and prudently rejected by the Hagerman majority. See Hagerman, supra at 734 n 12.

 See, e.g., Douglass v Pike Co, 101 US 677, 687; 25 L Ed 968 (1879) (“After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment.” ).

8 Remarkably, the majority proclaims that Justice Black’s views are “no authority at all” and, thus, his views need not even be considered in this debate. Ante at 518. Accordingly, the majority tries mightily to ignore Justice Black’s view that overruling precedent that previously interpreted a statute always amounts to a violation of separation of powers. Presumably this is because those in the majority believe that a separation of powers argument is uniquely theirs to make. But the majority’s attempts to discount Justice Black’s views are flawed. For example, the majority claims that Justice Black’s view may be consistent with the United States Constitution’s separation of powers principles but not our own. Yet the majority does not explain how the fundamental principle embodied in the United States Constitution practically differs from Michigan’s: “the doctrine of separation of powers ... is set forth in Const 1963, art 3, § 2, which provides that ‘[t]he powers of government are divided into three branches: legislative, executive and judicial,’ and further provides that ‘[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.’ ” Warda v Flushing City Council, 472 Mich 326, 334 n 4; 696 NW2d 671 (2005). Additionally, the majority claims that Justice Black’s view may be applicable in the United States Supreme Court given the peculiar nature of “that Court’s need to devote itself primarily to constitutional adjudications.” Ante at 517 n 35. However, contrary to the majority’s understanding, the United States Supreme Court’s jurisdiction is not so limited:
The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and *539 Treaties made, or which shall be made, under their Authority; — to all Cases affecting Ambassadors, other public Ministers and Consuls; — to all cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; — to Controversies between two or more States; — between a State and Citizens of another State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects. [US Const, art III, § 2.]
See also Scalia, A Matter of Interpretation: Federal Courts and the Law (New Jersey: Princeton University Press, 1997), pp 13-14 (“A very small proportion of judges’ work is constitutional interpretation in any event. (Even in the Supreme Court, I would estimate that well less than a fifth of the issues we confront are constitutional issues — and probably less than a twentieth if you exclude criminal-law cases.) By far the greatest part of what I and all federal judges do is interpret the meaning of federal statutes and federal agency regulations.”).
Further, the majority claims that Justice Black’s view may pertain to the United States Supreme Court, but not state supreme courts, because the United States Supreme Court’s workload is daunting because that Court accepts appeals from many lower courts under its jurisdiction. But such an assertion ignores the reality that state supreme courts, including the Michigan Supreme Court, also accept appeals from the lower courts under their jurisdiction. Additionally and, frankly, comically, the majority attempts to discount Justice Black’s views simply because he voiced them in a dissent and the majority in that case rejected his views. But in the very case before this Court, the majority uses the Hagerman dissent as its primary authority for concluding that Hagerman was wrongly decided and, therefore, must be overruled.
Finally, the majority attempts to argue that Justice Black’s view is not defensible under the Michigan Constitution because our Constitution forbids a court from exercising legislative power. Accordingly, the majority protests and simplistically asserts that it cannot amend statutes. But this is the very point Justice Black was attempting to make, and apparently this point is lost on the majority. Justice Black posits that any “reinterpretation” of a settled statute is effectively an amendment. And because “we cannot ‘amend’ statutes,” Justice Black asserts that doing so would violate principles of separation of powers. Ante at 518. Again, it is not necessary to adopt Justice Black’s view for Michigan’s jurisprudence, and I am not advocating that we do so now. I do believe, however, that a Court that consistently preaches the importance of separation of powers should at least consider the thoughtful points raised on this very issue by a United States Supreme Court justice.

 For example, in Twichel v MIC Gen Ins Corp, 469 Mich 524; 676 NW2d 616 (2004), cited by the majority in this case, the current majority and the dissenters disagreed over whether the term “owner” as used in a particular insurance policy was ambiguous. After selectively consulting numerous dictionary definitions, the Twichel majority opined that “possession, control, and dominion are among the primary features of ownership.” Id. at 534 (emphasis deleted). Relying on these “primary features,” the current majority opined that the term “owner” was plain and, therefore, concluded that the person who died in that case was not entitled to benefits. On the other hand, the dissenters concluded that ownership may entail more than possession, dominion, and control. Rather unremarkably, the dissenters reasoned that “owner” may also mean the person “ ‘who has the legal or rightful title, whether he is the possessor or not.’ ” Id. at 537 (citation omitted) (Cavanagh, J., dissenting). Accordingly, the majority’s citation of Twichel, and other similar cases, is illuminating because, as the majority rightfully suggests, it clearly shows the differences between the current majority’s and the dissent’s views on ambiguity, as well as standard rules of judicial construction.

 Likewise, I will leave it to history and others to evaluate my record as well. Thus, I see no need to “rebut” the majority’s compilation in Sington, supra, or Victor E. Schwartz’s article in a recent Michigan Bar Journal, A critical look at the jurisprudence of the Michigan Supreme Court, 85 Mich B J 38 (January, 2006). I must note, however, that Mr. Schwartz is a renowned “tort-reform” advocate, and filed an amicus brief in support of the result reached by the majority in Henry v Dow Chemical Co, 473 Mich 63; 701 NW2d 684 (2005). I must also note that Mr. Schwartz’s article was part of a point-counterpoint discussion. Thus, I encourage readers to also explore Professor Nelson E Miller’s companion piece (Judicial Politics: Restoring the Michigan Supreme Court) disagreeing with Mr. Schwartz’s characterization, as well as the countless letters to the editors passionately disagreeing with Mr. Schwartz’s description of this Court that have appeared in subsequent issues of the bar journal. See 85 Mich B J 10-12 (March, 2006); 85 Mich B J 14 (May, 2006).